(C.D. 4117)

Berkshire Chemicals, Inc., et al. *v.* United States

United States Customs Court, First Division

(Decided November 4, 1970)

*George Bronz* for the plaintiffs.

*William D. Ruckelshaus*, Assistant Attorney General (*Bernard J. Babb* and *Steven R. Sosnov*, trial attorneys), for the defendant.

WATSON, Judge: These protests, consolidated for the purpose of trial, place in issue the classification of sodium sulphate imported between 1954 and 1966. Of the 28 entries, 22 were imported before the effective date of the Tariff Schedules of the United States and the merchandise therein was classified pursuant to paragraph 81 of the Tariff Act of 1930, as modified, as "Sodium sulphate, anhydrous." The merchandise in the remaining six entries was classified pursuant to item 421.44 of the TSUS as "Sulfate: * * * Anhydrous."

Plaintiffs claim classification of the importations pursuant to paragraph 1766 of the Tariff Act of 1930, as "Sodium: * * * sulphate, crude, or crude salt cake" and pursuant to item 421.42 of the TSUS as "Sulfate: Crude (salt cake)."

The dispute herein centers on the distinction to be drawn between anhydrous sodium sulphate and sodium sulphate in the form known as "salt cake." Plaintiffs contend that the distinction between the two intended by the statute is grounded essentially in the differing uses for which they are suitable. This conflicts with the presumptively correct finding of the appraising official based on laboratory tests showing the importation to consist of more than 99 percent sodium sulphate (with the exception of entry 286 of protest 66/44515 which was found to contain 87.7 percent sodium sulphate) in conformity with a 98.5 percent dividing line adopted by the Bureau of Customs.[1] Plaintiffs argue that the percentage of sodium sulphate is not the primary consideration in this matter and contend that the amount of impurities is of controlling importance. Plaintiffs contend that anhydrous sodium sulphate is a product acceptable for use in the detergent, dyestuffs and textile industries while salt cake is sodium sulphate acceptable for use only by kraft pulp and paper industry.

The facts established by the evidence herein are as follows: The sodium sulphate in 24 of the 28 entries consisted entirely of the product manufactured by Duisburger Kupferhutte at its plant in Duisburg, Germany, as a by-product of its extraction of metals from pyrite cinders. In the first "run" of this production process, the sodium sulphate produced is contaminated by iron residues from a prior copper recovery process. This grade of sodium sulphate is designated by the producer as its "VH" grade and contains iron oxide contamination of between 0.015 percent and 0.02 percent or between 150 and 200 parts per million. The record further indicates that all the sodium sulphate involved herein was sold to the kraft pulp and paper industry and by reason of the iron contamination was not acceptable for use in the detergent, dyestuffs and textile industries.

---

[1] Federal Register, June 1, 1966.

The three entries made at Brunswick, Georgia consisted of sodium sulphate produced in the United Kingdom as a by-product of the manufacture of sodium dichromate. These importations are visibly yellow and the record indicates that this evidence of contamination by sodium dichromate precludes their use in the dyestuffs, textile or detergent industries.

The remaining importation contained in entry number 752 of protest 67/66071 consisted of a mixture of the DKH "VH" grade with material of Belgium manufacture concerning which no testimony was adduced.

The contaminants mentioned above interfere with the action of dyes and render the color of the dyed product irregular and unpredictable. They impede the action of whiteners in detergents and give an undesirable appearance to the product. In sum, the record establishes that the importations, with the exception of entry number 752, are not suitable for use in the dyestuffs, textile or detergent industries and are acceptable for use only in the kraft pulp and paper industry.

In view of the proof regarding the suitability for use of the importation, the sole question before this court is whether the criteria of suitability for use is the determinative one in the classification of the instant merchandise. The issue, in short, is whether "salt cake" is sodium sulphate suitable only for use in kraft pulp and paper industry and whether anhydrous sodium sulphate is sodium sulphate suitable for use in the dyestuffs, textile and detergent industries, or, whether the distinction between the two is simply a matter of the percentage of sodium sulphate present in the product.

After studying the language of the tariff act and reviewing the legislative history, we reach the conclusion that the criterion of suitability for use is embodied in the tariff language as the principal characteristic distinguishing salt cake from anhydrous sodium sulphate. The history of the terms as revealed primarily in the Summaries of Tariff Information utilized by the Congressional committees involved in the drafting of the tariff acts, indicates that salt cake has generally been considered as the sodium sulphate used by the kraft pulp and paper industry and glass industry. Anhydrous sodium sulphate has generally been associated with the detergent, dyestuffs and textile industries. It does not appear that the distinction embodied in the tariff law is one based simply on the percentage of sodium sulphate.

Salt cake was made dutiable by name for the first time in the Tariff Act of 1883. Since that time a number of Summaries of Tariff Information have referred to its composition and uses.

In 1908,[2] in the discussion of sulphate of soda, salt cake was referred

<hr>

[2] Notes on tariff revision on the Tariff Act of 1897, page 83.

to as the by-product of nitric acid and hydrochloric processes. The uses referred to are in the manufacture of alkali, various kinds of glass, chiefly bottles, medicinal preparations and dyeing and printing.

The 1922 Tariff Act contains specific language for both salt cake and anhydrous sodium sulphate. The former was discussed in the Summary of Tariff Information of 1921 at page 1436 as the impure sodium salt of sulphuric acid used in the manufacture of inferior grades of glass and for the manufacture of sodium sulphide, Glauber salt and ultramarine. Anhydrous sodium sulphate was discussed solely as if it were one and the same with Glauber salt for tariff purposes:

### SODIUM SULPHATE ANHYDROUS AND GLAUBER SALT
#### (See survey A–18)

*Description and Uses.*—Sodium sulphate, crystallized, was discovered by a chemist named Glauber and is known commercially as Glauber salt. It is sodium sulphate crystallized with 10 molecules of water. It is used as an assistant in dyeing, for diluting dyes, and for the preparation of cooling mixtures. Ordinarily most sodium sulphate is used in the anhydrous form and only a small portion is converted into the crystallized Glauber salt. It is more economical to ship the anhydrous salt.

\* \* \* \* \* \* \*

*Important changes in classification.*—"Sodium sulphate, anhydrous," has been mentioned specifically, as it was held that calcined sodium sulphate, in powdered form, is dutiable as a chemical compound or mixture, and not within the provisions of paragraph 67, act of 1913, for sulphate of soda, crystallized, or Glauber salts. \* \* \*

We take particular note of the explanation in the above summary that anhydrous sodium sulphate was included by name for the first time in response to a holding by the Board of General Appraisers in T.D. 36192, G.A. 7864 (1916). This language indicates to us that the original motivation behind the specific mention of anhydrous sodium sulphate was to include it as a substance considered virtually the same as Glauber salt. Thus, at the time of its first mention, anhydrous sodium sulphate appears as an alternative form of sodium sulphate, used for the same purposes as the traditional Glauber salt.

In the discussion of salt cake in the Summary of Tariff Information for 1929 at page 2589, we find for the first time mention of percentage content of sodium sulphate.

### SALT CAKE

*Description and uses.*—Salt cake, a crude form of anhydrous sodium sulphate, occurs in lumps or powder, containing about 96

per cent sodium sulphate, together with salt, sulphuric acid, and impurities. It is used in the manufacture of Kraft paper stock by the sulphate process; the manufacture of plate, window, and bottle glass; and as a raw material for the production of heavy chemicals, such as sodium sulphide, Glauber salt, and refined anhydrous sodium sulphate. * * *

In the same Summary of Tariff Information, no percentage is included in the discussion of anhydrous sodium sulphate at page 392.

SODIUM SULPHATE
[Anhydrous sodium sulphate and Glauber salts]

*Description and uses.*—Sodium sulphate occurs in commerce in three forms: (1) Glauber salt, a crystalline solid containing 55 per cent water of crystallization; (2) anhydrous sodium sulphate, a white amorphous powder containing no water of crystallization; (3) salt cake, a crude form of anhydrous sodium sulphate which is free under paragraph 1667. About 44 parts of the anhydrous form are equivalent to 100 parts of the crystalline salt. Saving in transportation costs favors the use of the anhydrous compound wherever possible.

* * * Anhydrous sodium sulphate is used in the manufacture of ultramarine and soluble Prussian blue, in glass making, and the natural product is used in the preparation of Kraft paper.

In the 1948 Summaries of Tariff Information, percentages are mentioned in the discussions of both anhydrous sodium sulphate and salt cake. In volume 16, part 4, page 308, the relevant discussion of crude sodium sulphate or salt cake reads as follows:

This summary covers crude sodium sulfate or salt cake which is a crystalline material that appears in commerce both as a natural product and as a manufactured product. * * *

Both the manufactured product, which accounts for most of the domestic output, and the natural product contains from 93 to 98 percent of sodium sulfate and varying amounts of impurities consisting of iron, calcium, and magnesium compounds, salt, and sulfuric acid, depending upon the source from which it is obtained. Salt cake is marketed in two grades: Technical, and iron-free; and in forms ranging from coarse granules to a fine powder. The technical grade is used principally in the sulfate pulp industry. It is used also as a raw material in the production of Glauber salt, anhydrous sodium sulfate, sodium sulfide, and other heavy chemicals. * * * A relatively new and rapidly expanding use of the technical grade is in the manufacture of soapless detergents. Most of the iron-free grade is used in the glass industry chiefly in the manufacture of flat glass, where the principal requirement of the salt cake is a very low content of iron oxide (not more than 0.01 percent) and of other impurities that impart an undesirable color to the glass.

In volume 1, part 5, at page 158 the Summaries discuss sodium sulphate as follows:

> Anhydrous sodium sulfate is one of two forms in which refined sodium sulfate appears commercially. The other is glauber salt, which contains 10 molecules of water of crystallization * * *. Anhydrous sodium sulfate is made by heating glauber salt sufficiently to drive off its water of crystallization. The resulting dehydrated product, which contains over 99 percent sodium sulfate, is a white amorphous powder. * * *

The Encyclopedia of Chemical Technology, volume 12, in its discussion of sodium compounds, reads as follows at page 608:

> Crude sodium sulphate, salt cake, is usually tested for free sulphuric acid and undecomposed sodium chloride. It is analyzed for minor impurities such as iron, calcium, aluminum, and insoluble matter, the sodium sulphate content being determined by difference. The technical grade usually contains 95–98% sodium sulphate.

The Condensed Chemical Dictionary,[3] defines salt cake as "impure sodium sulfate, $Na_2SO_4$ (90–99%), obtained in furnaces in the manufacture of hydrochloric acid and sodium sulfate from salt and sulfuric acid or sodium acid sulfate (niter cake). Impurities are sodium bisulfate, calcium sulfate, iron sulfate, iron oxide, magnesium sulfate, silica, and sodium chloride. Uses: Water glass; plate and window glass; sodium salt; ceramic glazes; ultramarine; diluting dyes; paper pulp; soap; detergent compositions."

We do not consider the percentages mentioned in the Summaries of Tariff Information or in the chemical dictionaries as being of controlling stature or determinative accuracy. They are cited in the Summaries only as approximations. Nowhere do they assign the percentile between the 98th and 99th to either salt cake or anhydrous sodium sulphate. Read in their full context, the explanations they offer are only approximate guidelines in an area marked by subtle, fractional considerations.

The true distinction which emerges from the legislative history and the study of the authorities, is that salt cake is an impure form of anhydrous sodium sulphate and further that it is not the quantity of sodium sulphate but the nature and quantity of impurities which make a meaningful difference between the two. Admittedly, this has been a very close question but as between an interpretation which places primary reliance on percentages in an area requiring finer distinctions and one which relies on the overall nature of the product whose use is closely tied to its composition, we discern a Congressional

---

[3] 5th edition (Reinhold Publishing Corporation) (1956).

intent revealed in the Summaries of Tariff Information to embody the latter standards in the tariff language.

We have been particularly impressed with the original association of anhydrous sodium sulphate with Glauber salt at the time of its first inclusion in the Tariff Act of 1922 and the parallel development and existence of distinct use differentials between salt cake on the one hand as applied to the kraft pulp industry and anhydrous sodium sulphate as applied in the dye industry and detergent industry. We are not unaware that the legislative history has elements which do not conform completely to the dichotomy we discern, such as the mention in the 1948 Summaries, *supra*, of the use of a technical grade of salt cake in the manufacture of soapless detergents. These minor inconsistencies, however, must yield to the more frequent and more consistent distinctions present in the legislative history. We are of the opinion that the only long standing distinction of any clarity and certainty which separates salt cake from anhydrous sodium sulphate is their suitability for different uses or, phrased differently, the unsuitability of salt cake for use in dyeing and detergent applications and its virtual restriction to kraft paper applications. Without reference to possible use, the concept of "impurity" is without substance and without accuracy. Since we consider the only clear definition of salt cake to be that it is impure anhydrous sodium sulphate a full definition must be expressed in terms of suitability for use.

We are further persuaded by the testimony that the definition of crude salt cake is possible only by reference to its suitability for use and mode of utilization in commerce. With this in mind, we turn to the importations in question and find that the evidence clearly establishes that the sodium sulphate involved herein is a variety fit only for use in kraft paper manufacture by virtue of the presence of contaminants in a quantity greater than that acceptable for use in dyeing or detergents. In this respect, the importations conform to our understanding of the term "salt cake" as utilized in the Tariff Act of 1930. We except from this conclusion the merchandise involved in entry No. 752 of protest 67/66071 which, inasmuch as it consists of a mixture of the DKH sodium sulphate with material of Belgium manufacture concerning which no testimony was offered, cannot be said to possess the impurities which would identify it as salt cake.

We conclude that the 98.5 percent standard adopted by the Bureau of Customs in its announcement in the Federal Register of June 1, 1966, does not conform to the tariff distinction between anhydrous sodium sulphate and crude salt cake. Said percentage is without support in the legislative history or the authorities and seems to be merely the result of taking a middle position between approximate percentages. We are of the view that the correct distinction between

the two lies in whether or not they are acceptable for use in such industries as the dye or detergent industry or the kraft industry.

We are of the opinion that the evidence herein establishes that the presence of about 0.005 percent of iron oxide in sodium sulphate is sufficient contamination to render it unsuitable for use in the dye and detergent industries and hence indicates that it is that product known as "salt cake." We are further of the view that the evidence herein establishes that the presence of a yellow color, indicative of contamination by sodium dichromate also indicates the product's unsuitability for said uses and its identity as salt cake. Since the evidence further establishes that, by virtue of the derivation of the importations from pyrite cinders, the iron oxide contamination amounts to between 0.015 percent and 0.02 percent, or between 150 and 200 parts per million, it is clear that the importations conform to the definition of salt cake.

Judgment will issue accordingly.